Jack Holland ANTHONY,
Defendant-Appellant,

v.

UNITED STATES of America,
Plaintiff-Appellee.

Jack Holland ANTHONY, Defendant,

v.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Vernon V. SISNEY, Intervenor-Appellant.

Nos. 80–1953, 81–2020.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 30, 1981.

Decided Nov. 24, 1981.

Rehearing Denied Feb. 5, 1982.

Michael E. Tigar, Washington, D. C., (John J. Privitera, Washington, D. C., with him on the brief), of Tigar, Buffone & Doyle, Washington, D. C. (Steven W. Taylor of Gotcher, Gotcher & Taylor, McAlester, Okl., with him on the brief), for Jack Holland Anthony.

John R. Osgood, Asst. U. S. Atty., Oklahoma City, Okl. (David L. Russell, U. S. Atty., Oklahoma City, Okl., with him on the brief), for United States of America.

Andrew M. Coats of Crowe & Dunlevy, Oklahoma City, Okl., for Vernon V. Sisney.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

These are consolidated appeals. Jack Holland Anthony appeals from his conviction under 18 U.S.C.A. § 2511(1)(a), unlawful interception of wire communications. Dr. Vernon V. Sisney appeals from the District Court's order denying him standing to oppose Anthony's motion for discovery in aid of Anthony's motion for new trial and order requiring discovery of certain tapes which were the product of Anthony's unlawful interception of wire communications.

Anthony was charged with illegally wiretapping the telephones of Dr. Richard Sternlof, Dr. Vernon V. Sisney and Dr. Jerry Lucas. Trial was had before a jury in the United States District Court for the Western District of Oklahoma. The jury convicted Anthony of illegally tapping Dr. Sternlof's phone. However, the jury was unable to reach a verdict on the remaining charges involving the tapping of Dr. Sisney's and Dr. Lucas' phones.

Anthony does not challenge the sufficiency of the evidence. Thus, at the risk of oversimplifying this rather involved situation, the relevant facts are as follows.

At the time of his arrest, Anthony was a graduate student studying for a Ph.D. in psychology. In the course of his studies, Anthony came to be associated with a Dr. George Bakouras and the Bakouras Foundation. Suffice it to say that there existed a good bit of hostility between Dr. Bakouras and other psychologists in Oklahoma City, including Dr. Sternlof and Dr. Sisney.

On February 20, 1980, a Southwestern Bell Telephone Company employee discovered wiretapping equipment on a telephone pole which serviced Dr. Sternlof's home. Upon investigation, it was determined that there was no court authorization for surveillance of the Sternlof's phone. The telephone company then informed the F.B.I. of the situation.

That evening F.B.I. agents set up surveillance of the area surrounding the telephone pole. In the early morning hours of February 21, 1980 the agents observed Anthony approach the area in a 1980 Oldsmobile

Cutlass. They then observed Anthony bend over a fishing tackle box containing the wiretapping device. When the agents arrested Anthony he was wearing yellow latex gloves and had a cassette tape in his possession.

A subsequent search of the automobile, pursuant to a warrant, yielded more blank cassette tapes and a CB radio with magnetic mount antenna. In addition to the search warrant for the car, a search warrant for Anthony's residence was issued on the basis of an affidavit sworn to by F.B.I. Agent Coy A. Copeland. The search of the house resulted in the seizure of a quantity of electrical and electronic equipment, blank and recorded cassette tapes, file folders bearing the names of Dr. Sternlof and Dr. Sisney, photographs of the Sternlof and Sisney homes, and various other incriminating evidence. The fruits of this search led to the discovery of taps on the phones of Dr. Sisney and Dr. Lucas.

At trial, Anthony testified in his own defense. Anthony testified that in January of 1980 he was contacted by a woman identifying herself as Carol Sherman. Ms. Sherman allegedly told Anthony that she was conducting an investigation at the request of a spouse of an opponent of the Bakouras Foundation. Ms. Sherman allegedly provided Anthony with information tending to establish a conspiracy between Dr. Sternlof and Dr. Sisney to drive Dr. Bakouras out of business. Ms. Sherman enlisted Anthony's help in conducting her investigation. Anthony claims that he believed that the wiretapping activity was being conducted with the consent of the spouse of one of the subscribers to the intercepted lines. He claimed that on the night of his arrest Ms. Sherman was with him in the car but that in the confusion surrounding the arrest she slipped away unnoticed. The defense contended that it was unable to locate Ms. Sherman to testify at the trial.

Although there were numerous motions and memoranda filed in this case, we are primarily concerned in Anthony's direct appeal with a motion to suppress the evidence gathered from the search of Anthony's residence and a motion for a new trial based upon governmental misconduct. Both motions were denied by the trial court. Dr. Sisney's appeal stems from Anthony's post-trial motions for a new trial on the basis of newly discovered evidence and for discovery of certain tapes, including tapes of conversations intercepted from the Sisney household [hereinafter referred to as the Sisney tapes]. These motions were made while Anthony's direct appeal was pending in this court. In response to Anthony's motion for discovery of the tapes, Dr. Sisney filed a motion to intervene for the purposes of opposing Anthony's discovery motion and to move to suppress the contents of the tapes obtained by the tap on his phone. The trial court denied Sisney's motion and granted Anthony's motion for discovery to the extent of an *in camera* review of the tapes by defense counsel for the limited purposes of presenting evidence on the motion for new trial. This court stayed the trial court's order pending this appeal by Dr. Sisney.

In Anthony's direct appeal from his conviction, he presents four contentions of error involving (1) the sufficiency of the affidavit for the search warrant authorizing the search of Anthony's residence; (2) the propriety of the trial court's action in denying his motion for a new trial based upon governmental misconduct; (3) the effect of certain jury instructions; and (4) the application of the Jencks Act.

In the Sisney appeal, two issues are presented. First we must decide whether or not the trial court erred in finding that Sisney did not have standing to oppose Anthony's discovery motion, and second, whether the trial court's order granting Anthony limited discovery of the tapes was error.

We affirm Anthony's conviction for unlawful interception of wire communications in violation of 18 U.S.C.A. § 2511(1)(a). We reverse the trial court's order granting discovery of the Sisney tapes.

I.

Anthony alleges that the trial court erred in finding that the affidavit supporting the

search warrant issued for the search of his residence contained sufficient information to establish probable cause to believe that evidence of illegal wiretapping would be found there.

The affidavit executed by F.B.I. Agent Copeland basically set forth the circumstances leading up to Anthony's arrest and recited that Anthony's address was listed on a car rental agreement for the Oldsmobile, that upon being booked Anthony gave the same address and that Agent Copeland had personally observed the residence which he described. The affidavit also described the device used to intercept communications from the Sternlof phone. Based upon these facts, Agent Copeland stated that he had reason to believe that proofs of purchases of electronic equipment and other evidence in the form of electronic equipment were being concealed at the Anthony residence.

■ Our review of the sufficiency of an affidavit for a search warrant is limited and we will give deference to the issuing magistrate's determination of probable cause. *United States v. Rahn*, 511 F.2d 290 (10th Cir. 1975), *cert. denied*, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). In determining whether or not probable cause exists to believe that evidence of a crime will be found at the place to be searched, the magistrate is entitled to rely upon practical considerations of everyday life. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

From the description in the affidavit of the recording device,[1] it was not unreasonable for the magistrate to assume that this device had to be assembled. Taking this assumption one step further, it was reasonable to assume that Anthony might have assembled the device at his residence. *United States v. Melvin*, 596 F.2d 492 (1st Cir. 1979), *cert. denied*, 444 U.S. 837, 100

S.Ct. 73, 62 L.Ed.2d 48 (1979); *United States v. McCann*, 465 F.2d 147 (5th Cir. 1972), *cert. denied*, 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154 (1973). The following language from *United States v. Lucarz*, 430 F.2d 1051 (9th Cir. 1970) appropriately embodies this principle:

> The situation here does not differ markedly from other cases wherein this court and others, albeit usually without discussion, have upheld searches although the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property.

430 F.2d at p. 1055. *Quoted* with approval in *United States v. Rahn, supra.*

■ Anthony contends that because nobody directly observed any evidence of the crime at his residence and because he had no opportunity to conceal evidence there after his arrest, it was unreasonable to assume that evidence of the crime would be found at his home. However, as we noted in *United States v. Rahn, supra*, at p. 293 "[t]he affidavit need not contain information providing '... certainty that the objects sought will be found as a result of the search.' *Porter v. United States*, 335 F.2d 602 (9th Cir. 1964), *cert. denied*, 379 U.S. 983, 85 S.Ct. 695, 13 L.Ed.2d 574 (1965)." Nor, is it necessary for the affidavit to contain a recital that someone had personally observed evidence at the defendant's residence when it is reasonable to assume that certain types of evidence would be kept at a defendant's residence.

---

1. The statement of Special Agent Errol Lee Myers, Federal Bureau of Investigation, on February 21, 1980, that he seized and inventoried the contents of the device used to intercept wire communications of the residence of Dr. Richard Sternlof. The device consisted of the following:

1. Adventurer tackle box, Model 1203.

2. One PowerSonic Battery, Model PS 645, 6V. 4.5 Amp-Hr., # 01830.
3. One Panasonic cassette tape recorder, AutoStop C, AC/Battery Model.
4. One Archer Telephone Recording Control device, Catalog # 43236.
5. Red, black, brown and gray electrical wire and connectors.

■ The main feature that distinguishes Anthony's case and the cases we have cited above from the cases Anthony cites and relies on in his brief, particularly *United States v. Flanagan*, 423 F.2d 745 (5th Cir. 1970), is the nature of the evidence believed to be concealed at the defendant's residence. The device Anthony used to effectuate his crime had to be assembled. Thus, it differs markedly from the fruits of a crime, such as stolen merchandise, which lack the necessary nexus to the place to be searched.

Moreover, Anthony's situation is more akin to that present in *United States v. Haala*, 532 F.2d 1324 (10th Cir. 1976). In *Haala* we upheld the validity of a search warrant for the search of the defendant's dormitory room in Iowa and her apartment in Minnesota. The defendant was charged with sending an explosive through the mails. The affidavit in support of the search warrant alleged that the defendant's fingerprint was found on the wrappings of the explosive, that she had a motive for sending the explosive, and that she had the knowledge to assemble the explosive. Thus, in finding that the affidavit was sufficient to establish probable cause to believe that evidence of the crime would be found at the defendant's residences we recognized that it was reasonable to assume that evidence of an assembled device would be found at the defendant's home. Similarly, we find that Agent Copeland's affidavit in support of the search warrant for Anthony's home was sufficient to establish the requisite probable cause.

## II.

As a second assignment of error, Anthony contends that the trial court erred in denying, without a hearing, his post-trial motion for new trial based on governmental misconduct. In conjunction with his appeal, Anthony filed a motion to supplement the record with the grand jury testimony of Agent Coy A. Copeland and transcripts of telephone conversations between Assistant United States Attorney Susie Pritchett and Kitty Duncan, an employee at the Bakouras Foundation, which allegedly establish the governmental misconduct.

It appears that Anthony knew of the existence of the grand jury testimony prior to trial, and although it was Jencks Act material, he did not request it. Furthermore, Anthony had knowledge of and access to the tapes of the conversations between Susie Pritchett and Kitty Duncan at the time of trial. These documents were not introduced into evidence at trial and, thus, they are not part of the record on appeal.

■ Prior to oral argument on appeal, this court granted Anthony's motion to supplement the record. The Government then filed a motion for reconsideration of the court's order which was denied without prejudice. At oral argument, the Government renewed this motion. On reconsideration, we now hold that Anthony's motion to supplement the record must be denied. F.R.A.P. Rule 10(e), 28 U.S.C.A., allows a party to supplement the record on appeal. However, it does not grant a license to build a new record. *Fleming v. Gulf Oil Corporation*, 547 F.2d 908 (10th Cir. 1977), *Borden, Inc. v. Federal Trade Commission*, 495 F.2d 785 (7th Cir. 1974).

■ Thus, in considering the issue of governmental misconduct we are confined to a review of the original record on appeal. Anthony does not direct our attention to any specific instance of governmental misconduct appearing on the record other than some general testimony concerning the tapes of conversations between Kitty Duncan and Susie Pritchett. Regardless of the lack of evidence to substantiate the claim of governmental misconduct, we need not, in any event, reach the merits of the claim inasmuch as the trial court properly denied Anthony's motion for a new trial on the grounds that it was untimely filed. Anthony's original motion for a new trial was timely filed. However, it did not allege governmental misconduct as a ground therefor. The first allegation of governmental misconduct was made in a supplemental memorandum filed after the period for filing a motion for new trial had ex-

pired. In denying Anthony's motion, the trial court properly relied upon *United States v. Newman*, 456 F.2d 668 (3d Cir. 1972). The court there held that a defendant may not amend his motion for a new trial to include a new ground after expiration of the period prescribed by Fed.Rules Cr.Proc. rule 33, 18 U.S.C.A. Consequently we hold that the trial court did not err in denying Anthony's motion for a new trial based upon governmental misconduct.

## III.

■ Anthony further contends that the trial court erred in refusing to give a requested instruction. The requested instruction[2] basically sets forth the defense of consent. It states that if a party to a conversation or one who has the care, custody or control of the communication equipment gives consent to an interception, then the interception is lawful. This instruction differs slightly from the instruction concerning consent that was given by the trial court.[3]

The instruction given was almost a verbatim recital of 18 U.S.C.A., § 2511(2)(d). The only difference between the two instructions is that Anthony's requested instruction included the consent of a party who had the care, custody or control of the phone as a defense. This instruction embodies Anthony's defense that a spouse of one of the subscribers of the intercepted line had given Carol Sherman consent to tap the line and that inasmuch as Anthony was working with Carol Sherman, the admitted interception was lawful.

In our view, even if a spouse had given permission to Carol Sherman to tap the phone, such permission would not render the interceptions legal. On the issue of the legality of interspousal wiretaps *United States v. Jones*, 542 F.2d 661 (6th Cir. 1976), undertook an exhaustive review of Title III of the Omnibus Crime Control and Safe Streets Act, which includes 18 U.S.C.A. § 2511 under which Anthony was convicted. The court there concluded that there was no statutory exception in the Act for interspousal wiretaps.

The opposite result was reached in *Simpson v. Simpson*, 490 F.2d 803 (5th Cir. 1974), *cert. denied*, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974), on which Anthony places heavy reliance. However, even though the *Simpson* court recognized an interspousal exception to the wiretapping statutes, it noted that third-party wiretapping, even with a spouse's consent, would violate the Act because it entails a greater invasion of privacy than a tap by the consenting spouse personally. 490 F.2d at p. 809.

Accordingly, we hold that Anthony's requested instruction was an incorrect statement of the law. The court did not err in refusing to give it.

■ Anthony also alleges that the trial court committed plain error in giving the following instruction:

It is not necessary for the prosecution to prove that the defendant knew that a particular act or failure to act is a violation of law. Unless and until outweighed by evidence in the case to the contrary, the presumption is that every person knows what the law forbids, and what the law requires to be done. However, evidence that the accused acted or failed to act because of ignorance of the law, is to be considered by the jury, in determining whether or not the accused acted or

2. You are instructed that it is not unlawful under this statute for an individual to intercept a wire communication where one of the parties to the communication has given prior consent to such interception or where a person who has care, custody or control of the equipment used for the transmission of the wire communication has given prior consent to such interception.

3. It is not unlawful for a person not acting under color of law to intercept a wire communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act.

failed to act with specific intent, as charged.

Anthony contends that this instruction shifts the burden of proof to the defendant on the issue of specific intent which entails the determination of the willfulness of his act. If the instruction did in fact shift the burden of proof it was error to give it. *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The determination of whether or not an instruction shifts the burden of proof rests upon the interpretation that a reasonable juror would give to the instruction. In the *Sandstrom* case the jury was "told that a person intends the ordinary consequences of his voluntary acts." 442 U.S. at p. 517, 99 S.Ct. at p. 2455. However, the instruction did not inform the jury that this presumption could be rebutted. In Anthony's case, not only was the jury instructed that the presumption that a person knows what the law forbids could be rebutted, but the jurors were also instructed that they must consider ignorance of the law as bearing on the issue of specific intent.

In reviewing this instruction, together with all the other instructions, as we are compelled to do, *United States v. Beitscher,* 467 F.2d 269 (10th Cir. 1972), we hold that a reasonable juror would not have interpreted the instruction to mean that Anthony had the burden of proving a lack of willfulness in his act. The giving of the instruction did not constitute error.

## IV.

We have considered Anthony's brief mention of alleged error concerning Jencks Act material and find it to be without merit. Accordingly, Anthony's conviction for unlawful interception of wire communications is affirmed.

## V.

In a consolidated appeal, Dr. Vernon Sisney appeals from the trial court's determination that he was without standing to object to Anthony's motion for discovery of the illegal tapes made by Anthony in connection with his motion for a new trial based on newly discovered evidence. After determining that Sisney did not have standing, the trial court issued an order allowing Anthony *in camera* inspection of the illegal tapes for the limited purposes of presenting evidence on his motion for a new trial.

We granted a temporary stay of the trial court's order pending disposition of this appeal. Thus, we are confronted first with the question of whether or not Dr. Sisney has standing to object to disclosure of the tapes and, secondly, whether or not the trial court erred in allowing limited disclosure of the tapes. We emphasize that this appeal is limited to the issue of disclosure in regards to the Sisney tapes only.

■ Dr. Vernon Sisney was a participant in telephone conversations that were recorded without his knowledge or consent or the knowledge or consent of the other parties to the conversations, including family members and patients of Dr. Sisney. Dr. Sisney was the owner of the premises subjected to the electronic surveillance.

The Omnibus Crime Control and Safe Streets Act, 18 U.S.C.A. § 2518(10)(a) provides that,

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

An aggrieved person is defined in 18 U.S.C.A. § 2510(11) as,

"aggrieved person" means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed.

The trial court ruled that these statutes did not confer standing on Dr. Sisney. Relying on a footnote in *United States v. Liddy*, 354 F.Supp. 217 (D.D.C.1973), rev'd unpublished opinion, *United States v. Liddy and Allen*, No. 73–1020 (D.C.Cir. Jan. 19, 1973) the trial court found that these statutes apply only to illegal court-authorized wiretaps and not to tapping or bugging by private individuals. We must hold that this interpretation of the statutes is clearly erroneous in light of 18 U.S.C.A. § 2518(10)(a). That subsection allows an aggrieved person to move to suppress the tapes on three different grounds, one of which is that the communication was unlawfully intercepted. The other two grounds pertain to court approved wiretaps which nonetheless are illegal because the *authorization* was insufficient or the manner of the interception exceeded the *authorization*. If Congress had intended the statutes to apply only to illegal government taps, they would logically have limited the first ground for a motion to suppress to read "interception of communications without court *authorization*". Inasmuch as, under the Act, the government is the only entity recognized for purpose of court authorization, such limiting language would imply that the statutes apply only to illegal taps by the government. Furthermore, it is ironic to contend that these statutes do not apply to private persons for purposes of a motion to suppress in light of the fact that Anthony, a private person, was prosecuted under statutes contained in the same Act.

We hold that Dr. Sisney is an aggrieved person under the Act, that he has standing to object to Anthony's motion for discovery of the Sisney tapes and that he has standing to bring his motion to suppress.

■ Anthony contends that the trial court's order granting discovery is an interlocutory order and consequently non-appealable. We recognize that a discovery order is an interlocutory order. However, we believe that the present situation comes within the exception to the rule of non-appealability set forth in *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93

L.Ed. 1528 (1949). *Cohen* recognized that certain interlocutory orders are appealable "when they have a final and irreparable effect on the rights of the parties." 337 U.S. at p. 545, 69 S.Ct. at p. 1225. Dr. Sisney's right to suppress the tapes would be totally and irreparably lost if disclosure is allowed, even under the protections afforded by the trial court's order. The present case is but one aspect of the underlying situation in Oklahoma City which has attracted widespread attention. There are too many persons involved in the underlying conflict to ensure the confidentiality of these tapes beyond the *in camera* hearing on the motion for a new trial. Consequently, we deem it necessary, in the interest of justice, to reach the heart of this matter.

## VI.

We turn now to the question of whether or not Anthony is entitled to discovery of the tapes.

■ At the onset, Anthony contends that since he was not convicted of tapping Dr. Sisney's phone there has not been a finding that the interceptions were "in violation of this chapter", and therefore the Sisney tapes are not precluded from disclosure. The statutes prohibit disclosure of tapes when the person seeking to disclose the contents of the tapes knows or has reason to know that the tapes were illegally obtained. It is undisputed that there was no court authorization for the tap and that Dr. Sisney did not consent to the tap. Consequently, the tapes were obtained in violation of the statutes. It is immaterial that the jury did not find beyond a reasonable doubt that it was Anthony who illegally tapped Dr. Sisney's phone.

This issue concerning disclosure of illegally intercepted communications was addressed in *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). That case involved an appeal by witnesses to a grand jury proceeding from their contempt citations for refusing to answer certain questions, the answers to which would necessarily divulge the contents of illegally intercepted communications. The Court

noted that 18 U.S.C.A. § 2511(1), in addition to declaring unauthorized wiretaps illegal, renders it illegal to disclose the contents of the wiretaps. In discussing the overall scheme of Title III of the Omnibus Crime Control and Safe Streets Act, the Court said,

> The purposes of § 2515 and Title III as a whole would be subverted were the plain command of § 2515 ignored when the victim of an illegal interception is called as a witness before a grand jury and asked questions based upon that interception. Moreover, § 2515 serves not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct: [Footnote omitted].

408 U.S. at p. 51, 92 S.Ct. at p. 2362. The Court further observed:

> ... to compel the testimony of these witnesses compounds the statutorily proscribed invasion of their privacy by adding to the injury of the interception the insult of compelled disclosure. And, of course, Title III makes illegal not only unauthorized interceptions, but also the disclosure and use of information obtained through such interceptions. 18 U.S.C. § 2511(1); see 18 U.S.C. § 2520. Hence, if the prohibition of § 2515 is not available as a defense to the contempt charge, disclosure through compelled testimony makes the witness the victim, once again, of a federal crime.

408 U.S. at p. 52, 92 S.Ct. at p. 2363.

In the instant case, the trial court recognized the *Gelbard* decision in refusing to grant Anthony's motion for disclosure of the tapes made during the course of the trial. However, in ruling upon the later motion for disclosure made in conjunction with the motion for a new trial, the trial court said that *Gelbard* and other cases had "not foreclosed the possibility that the contents of the tapes might be admissible for impeachment purposes." [Order of August 25, 1981].

██ In support of its conclusion that illegal wiretap evidence may be used for impeachment purposes the court relied upon

*United States v. Caron*, 474 F.2d 506 (5th Cir. 1973). In *Caron*, the defendant assigned as error the trial court's admission of evidence procured by wiretap for impeachment purposes when there was no determination that the wiretap was legal. The court held that this evidence was admissible for impeachment purposes regardless of whether or not it was legally or illegally obtained. The court based this decision on the legislative history of Title III of the Omnibus Crime Control and Safe Streets Act. The legislative history of 18 U.S.C.A. § 2515 indicates that the section was not intended "to press the scope of the suppression role beyond present search and seizure law." S.Rep.No.1097, 90th Cong., 2nd Sess. Reprinted in [1968] U.S.Code Cong. & Ad. News 2112, 2184. Normal search and seizure laws have arisen in the context of the Fourth Amendment which is directed against the government, not against private individuals. Therefore, the search and seizure rules which allow the government to use illegally seized evidence for impeachment purposes, while applicable as in the *Caron* case to permit the government to use wiretap evidence to impeach the defendant, are not applicable to our situation inasmuch as Anthony is a private person. Thus, Fourth Amendment search and seizure rules do not come into play.

We find support for the position that a defendant charged with illegal wiretapping is precluded from using the illegal evidence to impeach a government witness in the text of Title III and the overall legislative history of the Act. Even when a wiretap is legal, the information derived from the wiretaps may only be disclosed under certain circumstances. 18 U.S.C.A. § 2517. The only circumstance that could be applicable in Anthony's case is contained in 18 U.S.C.A. § 2517(3). That subsection provides,

> Any person who has received, *by any means authorized by this chapter*, any information concerning a wire or oral communication, or evidence derived therefrom *intercepted in accordance with the provisions of this chapter* may dis-

close the contents of that communication ... [Emphasis supplied].

In reviewing the legislative history of 18 U.S.C.A. § 2517(3) we observe that Congress recognized the use of wiretapped evidence for impeachment purposes. After repeating the text of subsection (3), it is said, "It envisions, of course, the use and disclosure of *such* evidence at trial ... to impeach (*People v. Hughes*, 203 Cal.App.2d 598, 21 Cal.Rptr. 668 (1962)), a witness' testimony ..." S.Rep.No.1097, 90th Cong., 2nd Sess. Reprinted in [1968] U.S.Code Cong. & Ad.News, 2188–89. In *People v. Hughes, supra*, the court ruled that it was not error for the trial court to admit evidence of a taped conversation between the defendant and his wife and daughter for impeachment purposes. The wife and daughter consented to the interception of the conversation; accordingly, the evidence was legally obtained. Hence, we conclude that Congress did not intend to authorize the use of illegally obtained evidence for impeachment purposes. We deem this conclusion reasonable in light of the overall purposes of Title III of the Omnibus Crime Control and Safe Streets Act as set forth in the legislative history,

> Virtually all concede that the use of wiretapping or electronic surveillance techniques by private unauthorized hands has little justification where communications are intercepted without the consent of one of the participants. No one quarrels with the proposition that the unauthorized use of these techniques by law enforcement agents should be prohibited .... Only by striking at all aspects of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages. *The perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings.* Each of these objectives is sought by the proposed legislation. [Emphasis supplied].

S.Rep.No.1097, 90th Cong., 2nd Sess. Reprinted in [1968] U.S.Code Cong. & Ad. News, 2156.

Anthony nonetheless claims that if he is denied access to the illegal tapes for impeachment purposes his Sixth Amendment right to confrontation will be effectively foreclosed. Anthony seeks to align himself with victims of illegal wiretaps by citing to *Alderman v. United States*, 394 U.S., 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), *reh. denied*, 394 U.S. 939, 89 S.Ct. 1177, 22 L.Ed.2d 475 (1969), in which the defendant who was the victim of a wiretap sought discovery of the taped conversations. The *Alderman* court allowed discovery of the tapes to the defendant/victim under a protective order. The protective order was necessary to protect the interest of third parties not involved in the case, who were parties to the conversations. Contrary to what Anthony urges us to believe, the Court reasoned that since the defendant/victim already knew who these people were and most likely what was said, the protective order was sufficient to protect those third parties' interests.

Anthony also relies on *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) and *United States v. Bates*, 617 F.2d 585 (10th Cir. 1980). Those opinions held that, for impeachment purposes, the defendant's Sixth Amendment right to cross-examination overrode the witness' statutory right to confidentiality in juvenile records. Those cases are distinguishable from the present case inasmuch as the defendants in *Davis* and *Bates* sought discovery of legally obtained evidence, whereas Anthony seeks discovery of illegally obtained evidence.

■ Assuming, *arguendo*, that a defendant does have a right to use illegally seized evidence to impeach the credibility of a witness, that right is not absolute. A defendant may not use discovery as a fishing expedition. Anthony has not directed our attention to any specific testimony of any witness that could potentially be impeached. Anthony simply alleges,

> The record demonstrates that, as trial witnesses, [sic] Dr. Sisney testified in con-

tradiction to facts which appear on the tape recordings in issue, and that the tape recordings contain material of a substantially impeaching character.

[Appellee's Memorandum in Support of Motion to Dismiss Appeal and to Dissolve Stay, p. 10].

In attempting to establish the impeaching character of the tapes, Anthony constantly tries to distort the issue of his guilt by raising the propriety of Dr. Sisney's and other psychologists' actions in regard to Dr. Bakouras. In essence, Anthony would have us put Dr. Sisney on trial. Even had Dr. Sisney conspired with other psychologists to run Dr. Bakouras out of business, such evidence would not justify the interceptions or establish a lack of willfulness on Anthony's part. If such were the case, whenever a party had a grievance against another, the grievance would justify the use of illegal means to prove the validity of the grievance. This kind of conduct is exactly what the statutes are designed to control, i. e., private individuals may not take the law into their own hands.

The hostility between the psychologists provides some background for the case, but it is certainly collateral to the issue of whether or not Anthony willfully intercepted wire communications without court authorization. The impeaching character of this evidence cannot be allowed to obscure the issue of Anthony's guilt.

Moreover, Anthony's case is akin to the situation presented in *United States v. Liddy*, 509 F.2d 428 (D.C.Cir.1974), *cert. denied*, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975), wherein the appellant charged with illegal wiretapping contended that the court's refusal to disclose the contents of the tape violated his Sixth Amendment right to cross-examine. The court said,

Appellant was given ample opportunity to cross-examine Baldwin regarding the details of the wiretapping operation, his identifications of Liddy, and his ability to identify certain voices. Although questioning regarding the contents of the conversations which Baldwin allegedly overheard might have provided an additional area in which to test his credibility, such an examination was not required to afford appellant a fair opportunity to test the truth of the direct testimony. Under the circumstances of this case, the order prohibiting disclosure of the contents of the intercepted conversations vindicated the rights of the movants without undue interference with the rights of the accused.

509 F.2d at p. 446.

In light of the voluminous record and testimony concerning the hostility between Dr. Sisney and George Bakouras with whom Anthony was associated, we have no doubt that Anthony had ample opportunity for impeachment of the government witnesses.

Anthony also charges that government attorneys committed perjury in that they informed the trial court originally that the F.B.I. had reviewed certain tapes and that the tapes contained no exculpatory material. Later, Agent Copeland of the F.B.I. filed an affidavit that represented that neither he nor the F.B.I. had listened to the "Gillespie" tapes or the "Susie Pritchett" tapes. We fail to see the connection between the alleged perjury and the issue on this appeal, which is, whether or not Anthony is entitled to the Sisney tapes for impeachment purposes.

Although Anthony's argument is somewhat vague, it appears that his contention is that disclosure of the tapes is required to determine if the tapes contain exculpatory material. Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) the prosecution is required to disclose to the defense exculpatory material or evidence favorable to an accused. The present situation is unique in this regard. As noted in *Gelbard v. United States, supra*, disclosure of illegally intercepted communications is a crime in and of itself. It follows that if the sought-after material falls within the prohibition established in *Gelbard*, it is not admissible in evidence. Thus, if we were to require the prosecution to disclose the contents of the tapes for purposes of ascertaining whether they contain exculpatory mate-

rial, we would cast the prosecution in the role of a party to a crime. The *Brady* rule is designed to insure that the defendant receives a fair trial. However, the defendant's right to a fair trial does not encompass a right to profit from the fruits of his crime. Accordingly we find no merit in Anthony's contention.

Having decided that Dr. Sisney has standing to object to disclosure of the tapes and that Anthony is not entitled to the Sisney tapes for impeachment purposes, we need not decide whether the physician-patient privilege is applicable to the tapes.

The trial court's order denying Dr. Sisney standing to object to disclosure or to move to suppress the tapes, and further granting discovery of the Sisney tapes is reversed. The stay order on disclosure is made permanent.