UNITED STATES of America, Plaintiff,

v.

William MYERS, d/b/a Gift Sales, Defendant.

No. 82 10058 01.

United States District Court, D. Kansas.

Nov. 12, 1982.

100

Jim J. Marquez, U.S. Atty., Wichita, Kan., for plaintiff.

Vern Miller, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

On July 29, 1982, the United States Attorney filed an information charging the defendant, William Myers, with two misdemeanor counts for violations of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA).[1] Both counts allege violations of 7 U.S.C. § 136$j$(a)(1)(A) which provides "it shall be unlawful for any person in any state to distribute, sell, offer for sale, hold for sale, ship, deliver for shipment, or re-

---

1. Act of June 25, 1947, c. 125, 61 Stat. 172 (codified as amended at 7 U.S.C. § 136a., *et* *seq.*).

ceive and (having so received) deliver or offer to deliver, to any person any pesticide which is not registered . . . ." Id. Count I charged the defendant with unlawful distribution of Chem-O-Kill, an unregistered pesticide,[2] to Howard's Supermarket (Howard's) on or about March 29, 1981. Count II charged the defendant with holding Chem-O-Kill for sale on or about March 11, 1982.

The defendant moved to suppress evidence seized pursuant to a search warrant because the warrant was issued without probable cause, and because the warrant did not sufficiently describe the place to be searched, all in violation of rights guaranteed by the Fourth Amendment to the United States Constitution. A hearing was held on September 30, 1982, at which arguments were presented, but no evidence was adduced. The following issues are before the court: (1) whether the description of the business premises to be searched was sufficient to enable the officers conducting the search to locate it, (2) whether the affidavits submitted in support of the search warrant establish the requisite nexus between the property sought and the place to be searched, and (3) whether the information contained in the affidavits was so stale that there was no reason to believe the items sought were still in the defendant's possession at the time the search warrant was issued.

 The Administrator of the Environmental Protection Agency (EPA) seeks to impose a criminal rather than a civil penalty in this case. See 7 U.S.C. § 136*l*. A federal search warrant based upon a suspected criminal violation of FIFRA must comply with the Fourth Amendment standards governing the issuance of federal search warrants in criminal cases. See Rule 41, Fed.R.Crim.P. The Fourth Amendment provides, in pertinent part, "no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. The conduct proscribed by the Fourth Amendment applies to the businessman who "has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." See v. City of Seattle, 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943, 946 (1967). Evidence which is seized by government authorities in violation of the Fourth Amendment is inadmissible against a defendant in a criminal trial. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, (1914), overruled on other grounds, Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

 In the context of a criminal investigation for violation of FIFRA, probable cause for the issuance of a search warrant exists if there are reasonable grounds to believe that the specific things to be searched for and seized are located on the property to which entry is sought. See, e.g., Zurcher v. Stanford Daily, 436 U.S. 547, 555, 98 S.Ct. 1970, 1976, 56 L.Ed.2d 525, 534–35 (1978). The guiding rule in the analysis of probable cause under the Fourth Amendment is that affidavits for a search warrant must be treated in a common-sense and realistic manner, and warrants are not to be given a hypertechnical interpretation. United States v. Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684, 689 (1965); In re Carlson, 580 F.2d 1365 (10th Cir.1978). Nevertheless, the Fourth Amendment requires that the facts as set forth in the underlying affidavit be sufficient to allow a neutral magistrate to reasonably conclude that probable cause for a search warrant exists. United States v. Hittle, 575 F.2d 799, 801 (10th Cir.1978). In

---

**2.** The affidavit for search warrant provides the following information:

The label on a sample of the CHEM–O–KILL collected on April 9, 1982, was reviewed by the Washington, D.C. office of the United States Environmental Protection Agency. CHEM–O–KILL is not registered nor is there an application pending for registration under § 3 of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) with the Administrator of the Environmental Protection Agency.

The Environmental Protection Agency formally cancelled all remaining registrations of DDT products on January 15, 1971. P.R. Notice 71–1. Only four very restricted uses remain for DDT. The CHEM–O–KILL label does not bear any of the allowable restricted uses.

determining whether there is probable cause to believe evidence of a crime will be found at the location to be searched, the issuing magistrate is entitled to rely on practical considerations of everyday life. *Anthony v. United States,* 667 F.2d 870, 874 (10th Cir.1981).

Three affidavits were submitted in support of the application for a search warrant. An affidavit for search warrant was submitted on Form A.O. 106 (rev. Apr. 1973) by an EPA enforcement officer.[3] The form affidavit incorporated by reference a supporting affidavit by an EPA case review worker[4] and a supporting affidavit by an EPA staff attorney.[5] The pertinent text of the affidavits is included in the above footnotes.

■ The defendant contends that the affidavits do not contain facts which would

---

**3.**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA | Docket No. 16 |
| | Case No. 81–1032M–01 |
| vs. | |
| William Myers doing business as Gift Sales Co. | AFFIDAVIT FOR SEARCH WARRANT |

BEFORE ... United States Magistrate, Room 230, 401 N. Market, Wichita, Kansas

The undersigned being duly sworn deposes and says:

That he has reason to believe that on the premises known as Gift Sales Co. 517 S. St. Francis at Wichita, in the District of Kansas, there is now being concealed certain property, namely Chem-O-Kill, an unregistered pesticide containing DDT which is being offered and held for sale, shipment, delivery and receipt as well as records of Gift Sales Co., showing that Chem-O-Kill has been distributed, sold, offered for sale, shipment, delivery and receipt, which constitute evidence of the commission of a criminal offense, to whit: a violation of 7 U.S.C. 136j, is contraband, and a thing criminally possessed.

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows: See attached affidavit of ... persons known to me to be employees of the Environmental Protection Agency.

**4.** The EPA case review officer stated, under oath:

I am the Environmental Protection Agency employee who reviewed the Gift Sales/William Myers file to determine what enforcement action should be taken for violations of FIFRA documented in the file. The following information was compiled by Daniel Tuggle for his investigative report, now part of the Environmental Protection Agency's file:

On April 9, 1981, a Kansas State Board of Agriculture inspector, Daniel Tuggle, found for sale on the grocery store shelves of Howard's Supermarket, Inc. in Wichita, Kansas, CHEM–O–KILL Insecticide For Flying Insects. The label on the aerosol spray can stated that CHEM–O–KILL insecticide contained dichlorodiphenyl trichloroethane (DDT) at a 3% concentration. The label also stated that CHEM–O–KILL was manufactured by Gift Sales Company, Wichita, Kansas. Mr. Tuggle was given an invoice by the supermarket President, Roger Tunks, for the sale of the CHEM–O–KILL apparently two dozen 12 oz. cans. The invoice listed the seller of the CHEM–O–KILL to be Gift Sales. The date on the invoice was March 29, 1981. Twenty-eight 12-oz. cans of CHEM–O–KILL were at the supermarket on April 9, 1981.

**5.** The EPA staff attorney stated, under oath:

On February 9, 1982, I made a telephone call to Mr. William Myers doing business as Gift Sales in Wichita, Kansas from my office in Kansas City, Missouri. I believe I called the number (316) 267–0671.

I introduced myself. Mr. Myers knows who I am because I have had at least two telephone conversations with him and have written a letter to him within the last year concerning the collection of an overdue $420 administrative penalty assessed in 1978.

I told Mr. Myers we had information that he had sold Chem-O-Kill which contained DDT to a supermarket in Wichita, and that as a follow-up I wanted to send an inspector down to check his production, sales and receipt (shipping) records for Chem-O-Kill. I said I wanted the inspector to look at the records required to be kept by the Federal Insecticide, Fungicide, & Rodenticide Act and federal regulations. I asked for his consent to conduct the search.

Mr. Myers ignored my question and blurted out that he did not think a federal case should be made out of the sale of 1 or 2 cases of Chem-O-Kill. He said that 4 or 5 cases had been sitting by the backdoor and he only wanted to recover the money had had invested in them.

\* \* \* \* \* \*

Mr. Myers said he probably had sales records that the inspector could review. I ended this conversation by saying I and my program (Environmental Protection Agency, Kansas City Office, Toxics and Pesticides Section) people would consider all the information he had given me on the sales and (non)production of Chem-O-Kill. I would get back to him if I still wanted to send an inspector.

enable the magistrate to determine either the precise location of the defendant's business or whether the property to be seized was being held there. The search warrant issued in this case describes the premises as "Gift Sales Co., 517 S. St. Francis, at Wichita, in the District of Kansas." A description in a search warrant need only be specific enough to enable the officers conducting the search to ascertain with reasonable effort the place to be searched. *United States v. DePugh,* 452 F.2d 915, 920 (10th Cir.1971). The name of a business, street address and city is a sufficient description for the purposes of a search warrant. *See, e.g., United States v. Adler,* 393 F.Supp. 707, 709–10 (E.D.Pa.1975) (name and street address of business is sufficient to describe premises for purposes of a search warrant). The defendant questions how the magistrate was able to arrive at the description based on the information provided by the EPA.

The following information is gleaned from the affidavits in this case. The enforcement officer testified to the street address of the defendant's business. The case review worker testified to an investigative report of a sale of Chem-O-Kill to Howard's by Gift Sales Company, Wichita, Kansas. The staff attorney testified to a telephone number he "believed" he called of Gift Sales Company, Wichita, Kansas, wherein the illegal transaction at issue was discussed with the defendant.

Affidavits incorporated by reference and attached to a search warrant should be read together. *See, e.g., In re Lafayette Academy,* 610 F.2d 1, 4 (1st Cir. 1979). The facts provided by the EPA concerning the name of the business, address and telephone number were readily verifiable by reference to a standard telephone directory. There was no reason to question either the reliability of the information or the credibility of the hearsay informant/investigator. There is also no allegation that the structure searched was a multiple-occupancy building. Under the circumstances, the magistrate reasonably concluded that the proper location description was furnished by the EPA.

In order to satisfy the probable cause requirement of a search warrant, there must be a reasonable basis to conclude that the property being sought is probably at the described location. The search warrant sought " 'Chem-O-Kill' aerosol spray cans" and "records of William Meyers d/b/a Gift Sales Co., which show that Chem-O-Kill or any other unregistered pesticide has been distributed, sold, offered and held for sale, shipment, receipt or delivery." As stated above one of the affiants related an investigator's report of a sale of Chem-O-Kill by the defendant to Howard's. The court finds that the magistrate reasonably concluded that records kept in the ordinary course of business and products dealt with by a business were probably located on business premises. *See Andresen v. Maryland,* 427 U.S. 463, 478 n. 9, 96 S.Ct. 2737, 2747 n. 9, 49 L.Ed.2d 627, 641 n. 9 (1976) (records kept in the ordinary course of business may reasonably be expected to be maintained at business offices). Affidavits for a search warrant do not have to establish to a certainty that property being sought is located in a certain place, reasonable grounds are sufficient. *Anthony v. United States, supra.*

### Staleness Doctrine

Staleness refers to the effect of time on evidence underlying the determination of probable cause. The philosophical underpinning of staleness is the principle that probable cause for the issuance of a search warrant dissipates with the passage of time unless a criminal enterprise is continuous. *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972). In *Sgro v. United States,* 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932), a search warrant for the seizure of illegal liquor was issued but was returned unexecuted after 10 days. The warrant was reissued 11 days later based upon the same affidavit. In overturning the defendant's conviction for violation of prohibition laws, the Court noted "it is manifest that the proof must be of facts so closely related to the time of the issue of the

warrant as to justify a finding of probable cause at that time." Id. at 210, 53 S.Ct. at 140, 77 L.Ed. at 263. The Court later recognized that in the balancing of probabilities, evidence of a continuing violation may tip the scales in favor of the issuance of a search warrant. *United States v. Harris,* 403 U.S. 573, 579n, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723, 731n. (1971). The Tenth Circuit Court of Appeals recently spoke to the staleness issue in *United States v. Schauble,* 647 F.2d 113 (10th Cir.1981). In *Schauble,* an affiant/informant testified he saw a quantity of "green leafy vegetation" which he believed to be marijuana at the defendant's residence within 48 hours of the issuance of the search warrant. Id. at 114–15. The court held the information was not stale because the statement could be interpreted to include growing marijuana which would be likely to continue to be present. Id. at 116. The court stated,

> We concur with Schauble's position that "the element of time is crucial to the concept of probable cause." *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972). But "the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit." *Id.* In resolving the question of staleness, the nature of the alleged criminal activity and the property to be seized must be considered. *See, id.; United States v. Sherman,* 576 F.2d 292, 295–96 (10th Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 284, 58 L.Ed.2d 259 (1978). "Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time." *Johnson,* 461 F.2d at 287. This is particularly true if the property to be seized can be easily transported or consumed. On the other hand, "where the affidavit properly recites facts indicating activity of a protracted and continuous nature . . . the passage of time becomes less significant," and facts otherwise remote in time may retain their relevance. *Id.*

While each case must, of course, be decided based upon its particular circumstances, an analysis of the cases suggests *four* factors to be evaluated in determining the staleness of evidence on which probable cause is based. These factors are: (1) the continuity of the alleged criminal activity; *see, e.g., United States v. Dennis,* 625 F.2d 782, 792 (8th Cir.1980); *United States v. Hyde,* 574 F.2d 856 (5th Cir.1978); *United States v. Johnson, supra,* at 287; (2) the time elapsed between the last events giving rise to probable cause and the issuance of the warrant; *see, e.g., United States v. Cofer,* 444 F.Supp. 146, 150 (W.D.Tex.1978) (unexplained delay of 106 days between last reported criminal activity and issuance of warrant rendered warrant invalid for staleness); annot., 100 A.L.R.2d, 525 (1965) (sufficiency of showing as to time of occurrence of facts relied on for search warrant); *see also* 92–105 A.L.R.2d Later Case Service 618 (1976) & Supp. 1982); (3) the use of words of present or past tense in affidavits supporting a search warrant; *see, e.g., United States v. Harris,* 403 U.S. 573, 579 n. *, 91 S.Ct. 2075, 2079 n. *, 29 L.Ed.2d 723, 731 n. [2] (1971) (use of the words "within the past 2 weeks" could indicate present activity and were sufficient for issuance of search warrant); *State v. Thompson,* 354 So.2d 513, 515 (La.1978) (affidavits relating supporting facts in the past tense were insufficient for issuance of search warrant) and (4) the likelihood that property being sought will have been moved; *see, e.g., Andresen v. Maryland, supra* at 478 n. 9, 96 S.Ct. at 2747 n. 9, 49 L.Ed.2d at 641 n. 9 (it is reasonable to expect that business records kept in the ordinary course of business would be maintained as long as 3 months); *United States v. Brinklow,* 560 F.2d 1003, 1006 (10th Cir. 1977) (it is reasonable that radio equipment intended for use in conjunction with motor home would still be present 11 months after last observed); *United States v. Van Ert,* 350 F.Supp. 1339, 1340 (E.D.Wis.1972) (it was not reasonable that movable, personal property would be present 55 days after last seen at place to be searched). Taking all of the factors into account, there must be a logical link between the criminal con-

duct, the property to be seized and the place to be searched at the time the warrant is issued. *See United States v. Brinklow, supra* at 1005–1006; J. Hall, Search and Seizure § 5:13 (1982).

In the case at bar, the warrant authorized the seizure of " 'Chem-O-Kill' aerosol spray cans" and "records of William Myers d/b/a Gift Sales Co., which show that Chem-O-Kill or any other unregistered pesticide has been distributed, sold, offered and held for sale, shipment, receipt or delivery." The criminal activity prohibited by 7 U.S.C. § 136*j* is dealing commercially in an unregistered pesticide.

The following facts were offered in support of the application for a search warrant. On April 8, 1981, an inspector found Chem-O-Kill for sale at Howard's. An employee of the store furnished a sales receipt listing the seller as Gift Sales Company. On February 9, 1982, an EPA staff attorney telephoned the defendant and confronted him with the investigator's report. The defendant acknowledged that "4 or 5 cases *had been* sitting by the backdoor." (emphasis added)

 There is nothing contained in the affidavits which would indicate anything more than an isolated sale of an unregistered pesticide. The government argues that the defendant wanted to recoup his investment and therefore had a motive to retain Chem-O-Kill for sale on his premises. Even assuming the defendant had that state of mind, it is not sufficient to show a continuing criminal enterprise. Motive alone is insufficient without evidence of solicitation or trafficking of a continuous nature.

The incident relied upon for the issuance of the search warrant occurred on March 29, 1981, according to the affidavits furnished to the magistrate. The affidavits in support of the application were dated March 1, 1982, at least 11 months after the reported violation. No explanation was given as to the delay between the incident of a sale of unregistered pesticide and the application for a search warrant. When the EPA staff attorney telephoned the defendant on February 9, 1982, the defendant

discussed the sale of Chem-O-Kill in the past tense. Although the defendant did indicate the possible existence of records, even a broad reading of the affidavit does not suggest grounds to believe the defendant was holding unregistered pesticides for sale at the present time.

The search warrant sought pesticides and commercial records. There are distinguishing characteristics between the generic categories which make it reasonable to conclude that commercial records are present on the business premises while reaching the opposite conclusion regarding the presence of unregistered pesticides. Sales records which are kept in the ordinary course of business are likely to be maintained, are not inculpatory per se and constitute mere evidence of a violation. On the other hand, an unregistered pesticide is a perishable, transportable commodity which, in legal parlance, constitutes contraband or an instrumentality of crime. Thus, an individual would be likely to move or dispose of an unregistered pesticide over a period of time. The same inference may not be made for business records which serve a legitimate accounting purpose.

 We hold that an isolated sale of an unregistered pesticide at least 11 months prior to the issuance of a search warrant supports a finding of probable cause to believe that records kept in the ordinary course of a business are on the business premises. However, an isolated sale of an unregistered pesticide 11 months prior to the issuance of a search warrant does not support a finding of probable cause to believe that aerosol cans of unregistered pesticide are being held for sale on the business premises. Accordingly, the court will sustain the defendant's motion to suppress 23 aerosol spray cans of Chem-O-Kill pesticide.

IT IS THEREFORE ORDERED that defendant's motion to suppress is granted, in part, and overruled in part. IT IS FURTHER ORDERED that 23 aerosol spray cans of Chem-O-Kill pesticide be, and hereby are, suppressed.